UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON


CIVIL ACTION NO. 1998-431 – WOB

KEITH RENE GUY, SR.,
ET AL.                                                    PLAINTIFFS

VS.                          <u>OPINION AND ORDER</u>

LEXINGTON FAYETTE URBAN
COUNTY GOVERNMENT, ET AL.                                 DEFENDANTS


This matter is before the Court on the individual defendants' motion for summary judgment on plaintiffs' civil rights claims (Docs. 538, 540); the individual defendants' motion for summary judgment on all claims other than civil rights claims (Doc. 542); all defendants' motion for summary judgment as to the claims of John Doe 33, John Doe 45, Rex Roe 94, and Rex Roe 95 (Doc. 545); and the LFUCG's renewed motion for summary judgment as to plaintiffs' civil rights claims (Doc. 546).

The Court heard oral argument on these motions on Wednesday, May 15, 2013.  (Doc. 635).  Having done so, the Court now issues the following Opinion and Order.

### *Procedural Background*

This case arises out of alleged sexual abuse perpetrated by Ronald Berry, founder of a summer program for disadvantaged youth called "Micro-City Government" ("MCG") in Lexington, Kentucky.  This program was funded in part by the Lexington-Fayette Urban County Government ("LFUCG").

The lengthy procedural background of this case need not be repeated in full here.[1]  However, several of the Court's prior rulings are relevant:

- **March 13, 2008**:  The Court granted motions for judgment on the pleadings by LFUCG, dismissing: (1) all state tort law claims against LFUCG on the grounds of sovereign immunity; (2) all claims based on respondeat superior; (3) claims for punitive damages against the LFUCG under the federal civil rights statutes; (4) RICO claims; (5) Title IX claims; (6) Title VII claims; (7) claims under 18 U.S.C. § 2255 and § 2258, statutes involving sexual abuse of minors.  (Doc. 313).

- **May 1, 2009**:  The Court granted in part and denied in part certain motions for summary judgment, holding that: (1) all claims, except those of four plaintiffs who were minors at relevant times, were untimely[2]; (2) for purposes of the § 1983 claim, a

---

[1] That background is summarized in two opinions of the United States Court of Appeals for the Sixth Circuit.  *See Guy v. Lexington-Fayette Urban County Gov't.*, 488 F. App'x 9 (6th Cir. 2012); *Doe v. Lexington-Fayette Urban County Gov't.*, 407 F.3d 755 (6th Cir. 2005).

[2] This ruling had the effect of reinstating as defendants fourteen individuals, although only as to certain plaintiffs whose claims against the individuals were timely.

triable issue of fact exists as to whether LFUCG had a "custom or policy" of inaction in the face of notice of Berry's unlawful activities and whether defendants' conduct constituted "deliberate indifference"; and (3) triable issues of fact exist on plaintiffs' claims under 42 U.S.C. §§ 1985 and 1986 based on evidence that LFUCG officials, in failing to respond to Berry's abuse, were motivated by a desire to capture the vote of the black community. (Doc. 382). The Court noted, however that "because all individual defendants were previously dismissed, defendants have not yet had either the reason or opportunity to brief the issues of qualified and perhaps other types (*e.g.*, legislative) of immunity." (Doc. 382).

The Court thereafter allowed additional discovery; denied class certification; allowed the addition of more plaintiffs, including those whose limitations periods were allegedly tolled due to mental disabilities; and set a trial date on the issue of liability only as to nine plaintiffs for August 2, 2010.

In September 2009, however, the Court agreed to certify to the Sixth Circuit the rulings on the statute of limitations and class certification. (Doc. 425). On February 8, 2010, the Sixth Circuit granted the petition to hear that appeal, and this case was stayed.

At the time of the stay, defendants had filed four motions for summary judgment, but the plaintiffs had not responded.

On May 2, 2012, the Sixth Circuit issued an opinion

3

affirming this Court's rulings as to the statute of limitations and class certification. *Guy v. Lexington-Fayette Urban County Gov't.*, 488 F. App'x 9 (6th Cir. 2012).

Thereafter, the Court ordered that briefing on defendants' 2010 motions for summary judgment be completed, and those motions are now ripe for decision.

### *Facts Relevant to Present Motions*[3]

**A.   LFUCG Structure**

Under the LFUCG Charter, the Mayor is the chief executive officer.  The Executive Branch consists of seven departments, each headed by a Commissioner appointed by the Mayor.  Within each Department are Divisions, which are headed by Division Directors.  Departments relevant to this action are the Department of Law, the Department of Finance, the Department for Social Services, and the Department of Public Safety, which includes the Division of Police.

The legislative body of LFUCG is the Urban County Council, which consists of 15 members.  The Council enacts ordinances, levies taxes, and appropriates funds.  The Mayor presides over Council meetings but has no vote, except in the case of a tie.

---

[3] The specific allegations of abuse by the individual plaintiffs need not be set forth here but will be discussed when necessary for the legal analysis that follows.

### B.   Micro-City Government

It is not disputed that MCG, despite its name, was a private, non-profit corporation.  MCG had an independent Board of Directors which chose its own members and which was responsible for oversight and management of MCG.  MCG made its own employment decisions for its staff as well as for its youth programs.

MCG received funding from LFUCG by submitting a funding request to the LFUCG Department of Social Services, whose Commissioner forwarded such requests to the Mayor. The Mayor would then determine whether to include funding requests in the preliminary budget that he or she drafted and submitted to the Urban County Council.  Appropriations for MCG were approved as part of the LFUCG budget by a vote of the majority of the Council.

Berry was Executive Director of MCG at all relevant times.  In addition, he was actually on LFUCG's payroll during summer months from 1982-1997 as administrator of a Summer Lunch Program.

### C.   Individual Defendants

There are fourteen individual defendants named in this case.  Their positions, and the information allegedly conveyed to them regarding Berry, are summarized as follows:

5

**H. Foster Pettit: Mayor 1972-1977.**

John Doe 21 testified that he saw Pettit at a party hosted by Berry in 1974 or 1975, where Berry was dressed in drag, and that sexual abuse occurred in Pettit's presence.  John Doe 21 also testified that he again saw Pettit at a party at Berry's house in 1978. (Doc. 334, Exh. B).

Carol Wigginton, who was Commissioner of Social Services in 1976 under Pettit, testified that she learned that sex and slave "games" were going on at MCG and that she informed Pettit.  Pettit told her that there wasn't anything they could do about it. (Doc. 334, Exh. J).

James Parsons, who was Director of the Mayor's Training Center, testified that he received calls from parents asking that their children not be placed at MCG because they suspected Berry was engaging in sex acts with young boys.  Parsons recommended to Pettit that MCG be de-funded (it is not clear from his testimony if he told Pettit about the alleged abuse, but it is implied), and Pettit told him that he did not think it was "politically sustainable."  (Doc. 334, Exh. E).

**James Amato: Mayor 1978-1981**

Former Vice-Mayor Ann Ross testified that she became aware that Berry was reputed to be gay and to "like young boys."  (Doc. 334, Exh. D).  She asked Amato's assistant if these things were true, and he said yes. Ross's testimony is ambiguous as to whether she told Amato.

Basha Roberts, who worked as a grant writer within LFUCG in the late 1970s, testified that youth counselors came to her stating that parents did not want their children assigned to MCG and asked if she could see that no money went to the program.  The parents related that young men assigned to MCG were expected to perform sexual acts with other men.  She testified that she heard such complaints "daily" during the fourteen months that she was employed by LFUCG.  As a result she and her Executive Director

recommended to Amato that MCG not receive funding because of these concerns.  Roberts testified that her Director told her that Amato overrode that recommendation and directed that she be told to "shut her mouth." (Doc. 334, Exh. ).

**Scotty Baesler: Mayor 1982-1993**

James Parsons testified that he told Baesler about the concerns about Berry having sex with young boys at MCG. (Doc. 334, Exh. E).

Carolyn Hope, who worked for Berry at MCG for four months, had concerns because she observed young boys going home with Berry.  She mentioned this to Berry, and he told her to mind her own business.  Soon thereafter, she was transferred and eventually fired without being paid.  Eventually, she called Baesler directly and told him that she had been fired for complaining about Berry's sexual misconduct with the young boys. (Doc. 334, Exh. F).

Gayle Slaughter testified that she met with Baesler in the early 1980s and asked him why the city was "still subsidizing Ronald Berry at Micro-City Government." (Doc. 334, Exh. G).  Baesler responded: "Oh you mean because he likes to mess with little boys, is that all?"

**Pam Miller: Mayor 1993-2002**

Carolyn Hope testified that she called Miller, who was then a councilwoman, at her home and told Miller that she had been demoted for complaining about the drug use and sexual activity going on at MCG. (Doc. 334, Exh. F).

Gayle Slaughter testified that she shared with Miller the conversation she had, above, with Scotty Baesler, and that Miller expressed knowledge of the pedophilia issue. (Doc. 334, Exh. G).

Carol Wigginton testified that in the late 1970s she saw Miller, then a councilwoman, at a party in Lexington and asked her if LFUCG was still funding MCG.  Miller said yes, and Wigginton said, "But, Pam

don't you realize – I know you realize that he is harming and doing bad things to the children." Miller responded, "Carol, it's worth the $43,000 just to not have to put up with all his noise." (Doc. 334, Exh. J).

James Parsons also testified that he expressed his concerns about the alleged sexual misconduct at MCG to Miller. (Doc. 334, Exh. E).

**George Brown, Jr.**: Council member 1994-2006

Basha Roberts testified that in the late 1970s she told Brown, who then worked in LFUCG but was not yet a council member, about the complaints of sexual abuse by Berry against young males at MCG. (Doc. 334, Exh. O).

**Robert Jefferson**: Council member 1988-2000

Greg Bolton, who worked for MCG from 1971 to 1973, and who later also worked for LFUCG from 1977 to 1979, testified that he was present at a "conference" at Georgetown College organized by MCG and attended by Berry. Numerous youth participants from MCG were bussed there for a weekend, and later a busload of homosexual men dressed as women arrived. Bolton observed one of the homosexual men having sex with a teenaged MCG participant, and he observed an orgy-like party where Berry was being tossed in the air and the young boys were running around in their underwear being grabbed by the adults. Bolton testified that Jefferson, who at that time was on MCG's board, was present at this conference and was told of Berry's activities. (Doc. 334, Exh. I).

**Michael Wilson**: Council member 1986-1993

John Doe 21 testified that Wilson constantly approached him, told him that he "goes both ways," and that Wilson told plaintiff that he (Wilson) had sex with several boys at MCG. John Doe 21 also testified that Wilson had sex with plaintiff's brother, John Doe 22. (Doc. 334, Exh. C).

8

**<u>Donna Counts</u>: Commissioner of Finance 1993-2006**

There does not appear to be any record evidence as to alleged knowledge of this defendant.

**<u>Barbara Curry</u>: Commissioner of Social Services 1978-2000**

Carolyn Hope testified that she complained to Curry about sexual misconduct, drug use, and possible physical abuse at MCG.

Greg Bolton, who worked for MCG from 1971 to 1973, and who later also worked for LFUCG from 1977 to 1979, testified that he showed Curry documentation of Berry's actions in the late 1970s in connection with a complaint made against him by Berry, and Curry asked him if she could have it and Bolton said no. After he showed Curry this documentation, she told him his job was not in jeopardy. (Doc. 334, Exh. I).

**<u>Mary Ann Delaney</u>: Commissioner of Law 1989-2003**

There does not appear to be any record evidence as to alleged knowledge of this defendant.

**<u>Arnold Gaither</u>: Director of Mayor's Training Ctr. 1990-2007.**

John Doe 20 testified that he saw Gaither at one of Berry's parties in the 1970s where children were drinking and using drugs. (Doc. 334, Exh. B).

Carolyn Hope brought her concerns about Berry taking young boys home to Gaither, then the Director of the Mayor's Training Center, and soon after that, she was transferred out of her job. (Doc. 334, Exh. F).

Basha Roberts testified that Gaither actually told her that he had been sexually propositioned by Berry when he had been a participant in MCG. (Doc. 334, Exh. O).

**<u>Sandra Nichols</u>: Financial analyst, administrator 1987-**

9

**2008**

There does not appear to be any record evidence as to alleged knowledge of this defendant.

**John McFadden: Chief of Police 1980-1990**

Carolyn Hope testified that she contacted Chief McFadden directly about her concerns about Berry, and he told her he had turned her complaint over to the juvenile division, but nothing ever happened.  (Doc. 334, Exh. F).

**Lawrence Walsh: Chief of Police 1990-2001**

There does not appear to be any record evidence as to alleged knowledge of this defendant.

**D.    Revelation of Abuse by Berry**

Based on third-hand reports of abuse, LFUCG conducted investigations into Berry in 1989 and 1990, but nothing came from them.  In 1997, however, two former MCG participants who alleged they were abused by Berry made reports to LFUCG and the Lexington police.  These reports led to Berry's arrest, prosecution, and conviction for sex crimes.

***Analysis***

**A.    Section 1983 Claims**

Plaintiffs' § 1983 claims allege that LFUCG and the individual defendants are liable for deliberate indifference for failing to take appropriate measures in

the face of actual or constructive knowledge of Berry's sexual abuse, under the "inaction" theory recognized in *Doe v. Claiborne County, Tenn.*, 103 F.3d 495 (6th Cir. 1996).[4] The Sixth Circuit noted in *Doe* that such a municipal liability claim triggers a two-pronged inquiry:

(1)  Whether the plaintiff has asserted the deprivation of a constitutional right at all; and

(2)  Whether the [municipal entity] is responsible for that violation.

*Id.* at 505-06 (citation omitted).  "For liability to attach, both questions must be answered in the affirmative."  *Id.* at 506.

"The threshold determination, therefore, is whether the sexual abuse perpetrated against [plaintiff] amounts to a constitutional violation."  *Id.*  The Sixth Circuit in *Doe* held that the plaintiff – who had been abused by a public school teacher – had established a constitutional violation because the Due Process Clause of the Fourteenth Amendment protects the right to be free from sexual abuse "*at the hands of a state actor*."  *Id.* (emphasis added).

Thus, there can be no liability under § 1983 here unless Berry's abuse amounted to a constitutional

---

[4] To the extent that plaintiffs allege liability for the funding of MCG, that claim is barred by the doctrine of legislative immunity.  *See Bogan v. Scott-Harris*, 523 U.S. 44, 55-56 (1998).

violation, which can be true only if he was acting under color of state law when he abused plaintiffs.  *See West v. Atkins*, 487 U.S. 42, 48 (1988) ("To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law.").  *See also Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (noting that "the under-color-of-state-law element of § 1983 excludes from its reach 'merely private conduct, no matter how discriminatory or wrongful'") (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1002 (1982)).

Only if Berry was acting under color of state law when he abused the plaintiffs will the second question -- whether LFUCG and the individual defendants may be held liable for failing to act -- arise.  *See, e.g., D.T. v. Indep. Sch. Dist. No. 16 of Pawnee County, Oklahoma*, 894 F.2d 1176, 1192 (10th Cir. 1990) ("deliberate indifference" claim against school district for hiring and failing to supervise teacher fails as a matter of law because teacher -- who molested children during summer vacation at non-school event -- was not acting "under color of state law" at time of abuse).

The Court notes that, despite the lengthy history of

12

this case, the "state action" issue as to Berry's conduct has never been decided.[5]

### 1.   State Action

The Supreme Court emphasized the importance of the state action requirement in *Lugar v. Edmonson Oil Co., Inc.*, 457 U.S. 922 (1982):

> Careful adherence to the "state action" requirement preserves an area of individual freedom by limiting the reach of federal law and federal judicial power. It also avoids imposing on the State, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed.  A major consequence is to require the courts to respect the limits of their own power as directed against the state governments and private interests.  Whether this is good or bad policy, it is a fundamental fact of our political order.

*Id.* at 936.

The Sixth Circuit has applied three tests to determine whether actions of a private entity may be fairly attributed to the state: (1) the public function test; (2) the state compulsion test; and (3) the symbiotic relationship or nexus test.  *Lansing v. City of Memphis*,

---

[5] At oral argument, defendants' counsel stated that the "state action" issue had been briefed in LFUCG's motion for summary judgment filed in 2008.  The Court has reviewed that motion and it appears that the "state action" question was addressed only in a footnote (Doc. 323 at 10 n.9), and then again briefly in the reply (Doc. 340).  The issue was not raised at all during the oral arguments on that motion, which lasted over two hours.  (Doc. 372).  Thus, it is only in the motions now before the Court that this issue has been fully developed and brought to the fore.

202 F.3d 821, 828 (6th Cir. 2000) (citations omitted).

Defendants assert -- and plaintiffs do not contest -- that

plaintiffs rely solely on the "nexus" test.[6]

"Under the nexus test, the action of the private party

constitutes state action when there is a sufficiently close

nexus between the state and the challenged action of the

regulated entity so that the action of the latter may be

fairly treated as that of the state itself." *Id.* at 830

(citation and internal quotations omitted). There is no

specific formula for this inquiry; rather the court must

consider the specific facts and circumstances present. *Id.*

The Sixth Circuit further explained in *Lansing*:

> *Although a positive test cannot be adequately*
> *formulated in the abstract, both this circuit and the*
> *Supreme Court have nevertheless identified some*
> *factors which are decidedly insufficient, by*
> *themselves, to justify a finding of a close nexus*
> *between the state and a private actor.*
>
> Consequently, it is now well-established that state
> regulation, even when extensive, is not sufficient to
> justify a finding of a close nexus between the state
> and the regulated entity.

---

[6] "The public function test requires that the private entity exercise powers which are traditionally exclusively reserved to the state, such as holding elections or eminent domain." *Id.* at 828 (citation and internal quotations omitted). The state compulsion test "requires that a state exercise such coercive power or provide such significant encouragement, either overt or covert, that in law the choice of the private actor is deemed to be that of the state." *Id.* at 829 (citation and internal quotations omitted). Plaintiffs have adduced no evidence which would make either of these tests applicable to MCG.

...

*Equally well-established is the principle that neither public funding nor private use of public property is enough to establish a close nexus between state and private actors.*

...

*The minority presence of public officials on the board of a private entity does not render the entity a state actor; nor does the approval or acquiescence of the state in private activity.*

...

Finally, the cases indicate that utilization of public services by private actors does not convert private action to state action.

*Id.* at 830-31 (emphasis added).

Further, there must be a relationship or nexus between the allegedly wrongful conduct and the specific governmental involvement. *Lansing*, 202 F.3d at 831; *Adams v. Vandemark*, 855 F.2d 312, 316 (6th Cir. 1988); *Crowder v. Conlan*, 740 F.2d 447, 453 (6th Cir. 1984). As the Sixth Circuit has stated, "it must be demonstrated that the state is *intimately involved* in the challenged private conduct in order for that conduct to be attributed to the state for purposes of section 1983." *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992) (citation omitted).

### a.   Application of Nexus Test to MCG

Here, it is not disputed that MCG was a private, non-

15

profit corporation founded by Berry in 1969.  It was not, in any way, part of the county or state government.  MCG had an independent Board of Directors which chose its own members and which was responsible for oversight and management of MCG.  MCG made its own employment decisions for its staff as well as for its youth programs.  Thus, neither MCG nor Berry can be deemed a state actor unless the "nexus" test is satisfied.[7]

Only two "nexus" factors are present here: MCG received most of its funding from LFUCG, and one LFUCG councilmember served for a time on the MCG Board, albeit not in an *ex officio* capacity.

However, these two factors are wholly insufficient as a matter of law to satisfy the "nexus" test, under Supreme Court and Sixth Circuit precedent.

In *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982), the Supreme Court held that a non-profit, privately-operated school for maladjusted high school students was not a state actor for § 1983 purposes, notwithstanding that virtually all of the school's income was derived from government funding.  *Id.* at 840.

Further, the Sixth Circuit held in *Lansing* that the

---

[7] Berry's role as a summer director of the lunch program, during which times he was actually a LFUCG employee, will be addressed below.

16

"minority presence of public officials on the board of a private entity does not render the entity a state actor; nor does the mere approval or acquiescence of the state in private activity." *Lansing*, 202 F.3d at 831 (holding that non-profit corporation was not a state actor, even though two of nine of its executive committee members were public officials; it received government funding; it cooperated with government in organization of city event; and it conferred an economic benefit on the city).

The Sixth Circuit has applied these principles to hold that private entities with even closer links to the state than MCG are not "state actors" for purposes of § 1983.

For example, in *Wolotsky*, the Court considered § 1983 claims brought against a private, non-profit agency that provided mental health services to the community.  The agency contracted with the county government to provide the counseling services; the contract required the agency to comply with government regulations; the agency received approximately 75% of its funding from the county; and the agency leased office space from the state for a nominal fee.  *Wolotsky*, 960 F.2d at 1334.  The Sixth Circuit held that "none of these circumstances, considered separately or together, make [the agency] a state actor for section 1983 purposes."  *Id.* at 1335.

17

Similarly, in *Crowder*, the Sixth Circuit rejected a claim that a private hospital sued under § 1983 by a doctor whose staff privileges had been denied was a state actor. The plaintiff established that the hospital received most of its revenues from the government; it was subject to extensive state regulation; the Mayor and County Judge/Executive served on its board; and the hospital facility was purchased by the County and then leased back to the hospital board through an arrangement authorized by a state statute. *Id.* at 449-50.  Nonetheless, the Sixth Circuit concluded:

> Here, the factors alleged by Dr. Crowder to constitute [state] action do not establish the same type of interdependence between the hospital and the state found in [other cases].  Neither the State nor County have [*sic*] become involved in the daily operations of the hospital.  Nor can it be said that either the State or County governments retain the type of control over the hospital's long-term future that was evident in [other cases].  *More importantly, neither government body has positioned itself to the point that it has in effect become a "joint participant in the challenged activity" thereby making the decision to restrict Dr. Crowder's staff privileges state action.*

*Id.* at 453 (emphasis added).  *See also Adams*, 855 F.2d at 316-17 (holding that non-profit community action agency was not state actor although agency was almost entirely publicly-funded; state law required that one-third of its board be composed of public officials; and it leased

18

building from city at nominal rate).

District courts in the Sixth Circuit have applied these precedents to reject claims of "state action" against state-funded non-profit corporations similar to MCG. *See, e.g., Bishop v. The Children's Ctr. For Dev. Enrichment*, No. 2:08-cv-766, 2011 WL 4337088, at *14-16 (S.D. Ohio Sept. 15, 2011) (holding that private, non-profit corporation that operated school for autistic children was not state actor subject to § 1983 claims; nexus test not satisfied by state regulation, public funding, presence of public officials on board, and use of public services); *Lownsberry v. Lees*, No. 06-13602, 2008 WL 4852791, at *13 (E.D. Mich. Nov. 7, 2008) (granting summary judgment on § 1983 "deliberate indifference" claims against community agency for hiring and failing to supervise teacher at agency-run preschool who allegedly sexually assaulted plaintiff; agency was private non-profit corporation "whose mere receipt of state funds does not transform its nature into that of a state agency"). *See also Schmitz v. Upper Des Moines Opportunity, Inc.*, No. C08-4087-MWB, 2009 WL 3019812, at *8 (N.D. Iowa Sept. 21, 2009) (holding that private, nonprofit corporation that provided services to low-income families, received state and local funding, and one-third of whose board was comprised of public officials

19

was not state actor).

Moreover, there is no close "nexus" between MCG's government connections -- funding and board membership -- and the alleged constitutional violation, sexual abuse. This is an additional and independent reason that "state action" is lacking. *See Lansing*, 202 F.3d at 831 ("Furthermore, the test requires a close nexus not merely between the city and Memphis in May in general, but specifically between the city and Memphis in May's request that [plaintiff] move outside the barricades."); *Adams*, 855 F.2d at 316 ("Rather, the plaintiffs must show that the lease or the funding affected the challenged acts, their discharges."); *Crowder*, 740 F.2d at 453 (same).

These authorities demonstrate that MCG -- and Berry as its director -- cannot be considered a state actor for purposes of the § 1983 claims asserted by plaintiffs who allege that Berry abused them in connection with MCG programs or activities. Because Berry was not acting under color of state law, his sexual abuse of plaintiffs -- however unlawful under criminal statutes -- did not violate their constitutional rights.

There is thus no underlying constitutional violation for which to hold LFUCG and the individual defendants accountable under the "inaction" theory. For this reason,

20

all defendants are entitled to summary judgment on the §
1983 claims of such plaintiffs.[8]

### b.   Lunch Program-Related Abuse

Separate from his role at MCG, Berry was directly on
the payroll of LFUCG during the summer months from 1982-
1997 as administrator of the Summer Lunch Program.  Two of
the plaintiffs -- John Doe 39 and Rex Roe 92 -- allege that
they were sexually abused by Berry in connection with the
Summer Lunch Program, in which lunches were provided to
children in city parks and other locations.

John Doe 39 alleges that he asked Berry for a job with
the Summer Lunch Program.  Berry asked this plaintiff, who
was then approximately twelve years old, to go pick up
lunches with him and said that he would give plaintiff a
job if everything went well.  On the way, Berry asked
plaintiff if he wanted to smoke marijuana, and plaintiff
said yes.  Berry then parked the van behind a building, the
two smoked marijuana, and Berry offered to pay plaintiff
$30 if he would let Berry perform oral sex on him.
Plaintiff acquiesced.

---

[8] There are also plaintiffs whose claims do not even arise
from employment by MCG or participation in MCG events,
*e.g.*, John Doe 45, who simply met Berry in a park.  Such
claims would thus also fail for lack of state action.  The
plaintiffs also agree that Rex Roe 94 should be dismissed
because he admits he was never molested by Berry.

Rex Roe 92, then aged fourteen or fifteen, worked in the Summer Lunch Program in the summer of 1994 or 1995. Berry praised his performance and offered to buy him lunch as a reward. Berry drove to Burger King and, while sitting in the van, grabbed plaintiff's genitals and asked if he could perform oral sex on plaintiff. Plaintiff refused and demanded that Berry take him back to the Carver Center.

"[S]tate employment is generally sufficient to render the defendant a state actor." *West v. Atkins*, 487 U.S. 42, 49 (1988) (citation omitted). A person "acts under color of state law when he abuses the position given to him by the state." *Id.* at 50.

However, "a defendant's private conduct, outside the course or scope of his duties and unaided by any indicia of actual or ostensible state authority, is not conduct occurring under color of state law." *Waters v. City of Morristown, Tenn.*, 242 F.3d 353, 359 (6th Cir. 2001) (citations omitted).

Defendants argue that Berry, even though employed by LFUCG to run the Summer Lunch Program, was acting outside that role when he allegedly abused these two plaintiffs. Defendants cite *Waters* and *Burris v. Thorpe*, 166 F. App'x 799 (6th Cir. 2006), as support for their position. These two cases, however, are distinguishable.

22

In *Waters*, the plaintiff was employed by, and in a personal relationship with, one of the defendants, a veterinarian who also happened to be a city alderman.  The relationship was a tumultuous and, ultimately, violent one, and plaintiff sued various defendants, including the city, under § 1983.  Although plaintiff alleged that the defendant used his position as alderman to bolster some of his behavior, the Court concluded that he was not acting under color of state law when he harassed the plaintiff. *Id.* at 359-60.  At most, it concluded, the defendant was occasionally "throwing his weight around" on peripheral matters, but the offending actions were taken in pursuit of his personal relationship with the plaintiff, wholly unrelated to his position as a city alderman.  *Id.*

In support of this conclusion, the Court noted that: (1) because of their personal relationship, the defendant would have been in the same position to harass and abuse the plaintiff even had he not been a city alderman; and (2) the plaintiff could not show "that *but for* [the defendant's] status as an alderman, he would not have been able to pursue these misdeeds." *Id.*

The case at bar presents a different situation. These two plaintiffs were exposed to Berry only by virtue of their employment, or attempt to obtain employment, in

23

the Summer Lunch Program.  The sexual contact occurred during the course of that relationship; indeed, it occurred while Berry was carrying out functions of the program. Berry obviously abused his authority within the program in order to carry out the abuse.  *See Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1304 (11th Cir. 2001) (concluding that city employee acted under color of state law because he invoked his authority to create opportunity to be alone with plaintiff, whom he then raped).

Defendants also rely on *Burris*, in which the Sixth Circuit concluded that a police officer who had sex with the plaintiff had not been acting under color of state law for purposes of § 1983 claims that the plaintiff brought after learning that the officer was HIV-positive.  The parties' sexual relationship, which persisted over several years, was consensual, and the plaintiff conceded that the defendant had never used his position as a police officer to coerce her to have sex with him or to prevent her from breaking off the relationship.  *Id.* at 802.

In contrast, there is evidence from which a reasonable jury could find that Berry was indeed using his position as head of the Summer Lunch Program to coerce sexual favors or contact from these two plaintiffs.  The acts would not have occurred but for the authority Berry possessed by virtue of

his position.

Therefore, these two plaintiffs can show that Berry acted under color of state law for purposes of their § 1983 claims.

### 2.   Municipal Liability: LFUCG and Individuals

Assuming these two plaintiffs abused by Berry in connection with the Summer Lunch Program can show a constitutional violation, the next question is "whether the municipal defendants are responsible for that violation." *Doe*, 103 F.3d at 507.

### a.   Individual Defendants: Duty Requirement

In *Doe*, the Sixth Circuit considered § 1983 claims against individual School Board members, school superintendents, and a school principal brought on the theory that these individuals were deliberately indifferent in connection with plaintiff's sexual abuse by a public school teacher.  As to the liability of School Board members who had no individual supervisory responsibilities over the teacher, the Court held:

> Because section 1983 has a "color of law" requirement, a board member can be held liable only if state law, whether provided by statute of implied, empowers him with some legal obligation to act. . . . A "duty" under "color of law" must be a distinct element of a section 1983 case alleging a "failure to act." **That is, a plaintiff must show that an individual defendant failed to act under color of law. . . . If state law does not impose a duty to take action, "there is no**

25

**conduit through which an exercise of state power can be said to have caused the constitutional injury." . . .**

Defendants' positions as board members, without more, cannot be the basis for the existence of this element; "a person does not act under color of state law solely by virtue of [his] relationship to the state," instead, liability depends on the nature of his conduct. . . . The absence of an identifiable duty would leave a malleable and elusive standard of conduct to which officials should conform their actions, rendering the causal connection between the omission and the deprivation far too abstract to impose section 1983 liability. . . .

*We conclude that to state a claim for a failure to act when the alleged wrongdoer is not a supervisory government official, a plaintiff must separately establish the "color of law" requirement of section 1983 by identifying some cognizable duty that state or federal law imposes upon the alleged "enactor." In the absence of a duty there is no section 1983 liability because the failure to act cannot be said to have occurred under color of law.*

*Doe*, 103 F.3d at 512 (citations omitted) (emphasis added).

A failure to articulate a duty imposed on an individual official sued under a § 1983 "failure to act" theory requires dismissal of the claim. *Williams v. Port Huron Sch. Dist.*, 455 F. App'x 612, 621 (6th Cir. 2012).

Plaintiffs have failed to address this argument, and they have not cited to any duty under Kentucky law that would render the individual defendants' alleged failure to act unlawful.[9]

_____

[9]   In 2009, plaintiffs referenced the Kentucky statute, KRS

The individual defendants are thus entitled to summary judgment on the § 1983 claims against them.[10]

### b.    LFUCG

LFUCG argues that this Court should revisit its prior ruling that a triable issue exists as to whether it can be liable under the "inaction" theory of municipal liability.

Assuming the "Lunch Program" plaintiffs can show a constitutional violation, they must also establish that LFUCG is liable for the violation.  Plaintiffs cannot base their claim against LFUCG solely on Berry's conduct, "for *respondeat superior* is not available as a theory of recovery under section 1983." *Doe*, 103 F.3d at 507 (citation omitted).

"Rather, [plaintiffs] must show that the [municipal entity] *itself* is the wrongdoer." *Id.*  Where liability is alleged to result from a "custom," that custom "must be so permanent and well settled as to constitute a custom or usage with the force of law." *Id.* (citation and internal

---

620.030, that requires the reporting of child abuse as a basis for arguing that defendants were estopped from asserting a statute of limitations defense.  This Court has already held, however, that the concerns allegedly conveyed to some of the individual defendants were not specific enough to trigger a duty to report under that statute. (Doc. 382 at 10-11 n.8).

[10] Because the claims against the individual defendants fail on the duty element, *a fortiori*, they are entitled to qualified immunity.

quotations omitted).

To state a municipal liability claim under an "inaction" theory, plaintiffs must establish:

> (1)  the existence of a clear and persistent pattern of sexual abuse by [municipal] employees;
>
> (2)  notice or constructive notice on the part of the [municipal entity];
>
> (3)  the [municipal entity's] tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and
>
> (4)  that the [municipal entity's] custom was the "moving force" or direct causal link in the constitutional deprivation.

*Id.* at 508 (citations omitted).

The evidence must show that the need to act is so obvious that the municipal entity's "conscious" decision not to act can be said to amount to a "policy" of deliberate indifference to plaintiffs' constitutional rights.  *Id.  See also Arendale v. City of Memphis*, 519 F.3d 587, 600 (6th Cir. 2008) (noting that in order to establish municipal liability under inaction theory, the evidence must show that the municipal entity "consciously never acted when confronted with its employees' egregious and obviously unconstitutional conduct").

"'Deliberate indifference' in this context does not mean a collection of sloppy, or even reckless, oversights;

it means evidence showing an obvious, deliberate indifference to sexual abuse." *Doe*, 103 F.3d at 508.

Although this legal standard for municipal liability is a stringent one, the Court again concludes that the record contains evidence from which a reasonable jury could find that LFUCG was deliberately indifferent to the constitutional rights of those plaintiffs who can clear the "state action" hurdle.  That is, there is testimony that, over a roughly thirty-year period, various LFUCG officials -- including four Mayors who held that office from 1972 to 2002 -- were informed that Berry was engaging in sexual activity with youth participants of MCG and that these officials consciously decided not to take action based on political or other considerations.

In addition to the information allegedly communicated to the individual defendants, set out in the fact section above, plaintiffs have adduced evidence that other LFUCG officials knew of Berry's alleged abuse and chose not to act.  This evidence is extensive and includes:

- James Parsons testified that he communicated numerous times with members of the Urban County Council regarding Berry's abuse, including Mayors, a Chief of Police, and Commissioners of Public Safety, Social Services, Law, and Finance.

- Carolyn Hope testified that she spoke to police officers and detectives about her concerns about Berry and was told that everyone knew about it, it had been

29

going on for years, and they were not going to do anything about it.

- Carol Wigginton testified that she told Commissioner of Public Safety Burt Hawkins about the "sex games" at MCG.

- Council member Scott Crosbie testified that, when he learned of the alleged abuse by Berry, he went to Vice-Mayor Ann Ross, who indicated that she was aware of the issues.

In the face of such knowledge on the part of Mayors and other LFUCG officials, Berry was nonetheless placed in a position of authority running the Summer Lunch Program, during which he had extensive contact with children.  A jury could thus reasonably find that LFUCG was deliberately indifferent to the risk that Berry would abuse young males in connection with that program.

LFUCG argues repeatedly that it cannot be found to be deliberately indifferent because no specific, named victim was identified.

While it is true that "mere rumors or unsubstantiated allegations" are not enough to show the "persistent pattern" necessary for a deliberate indifference claim, *G.M. v. County of Beltrami*, No. 00-1767, 2002 WL 31163131, at *6 (D. Minn. Sept. 23, 2002), this case is qualitatively different than those cited by LFUCG.  Here, there is evidence that high-ranking government officials acknowledged that they knew of Berry's sexual proclivity

30

for young boys but yet placed him in a position where he would have ready access to them.  Moreover, this occurred, viewing the evidence in plaintiffs' favor, *over a period of nearly thirty years*.  That no specific victim's name was known until the 1990s is thus immaterial.

LFUCG further argues that it cannot be held liable for failing to act because it *did* act: twice, by investigating Berry in 1989 and then in 1990.  While this argument has appeal, it ignores the evidence that LFUCG Mayors and other officials had actual or constructive knowledge of Berry's sexual abuse as early as the mid-1970s, at least fifteen years before officials ever investigated Berry.  As noted, there is testimony that, during those intervening years, LFUCG officials expressed actual knowledge of the abuse by Berry and indicated a conscious decision to do nothing.

A reasonable jury could thus conclude that these conscious decisions evolved into a *de facto* LFUCG custom, as a municipal entity, to ignore Berry's actions and the resulting violation of these plaintiffs' constitutional rights.  As the Sixth Circuit stated in *Doe*, if "a plaintiff advances sufficient evidence to create a genuine issue of material fact as to the existence of such custom or policy, then the question of 'deliberate indifference' is one for the jury to decide and not for the court at the

31

summary judgment stage." *Doe*, 103 F.3d at 509 (citation omitted).

The Court will thus deny LFUCG's renewed motion for summary judgment on this issue.

**B.**   **Sec 1985 & 1986 Claims**

In this Court's May 1, 2009 opinion, it declined to grant summary judgment on plaintiffs' claims under 42 U.S.C. § 1985 and 1986.  LFUCG asks the Court to reconsider that ruling because plaintiffs have shown no evidence of a conspiracy and because the element of racial motivation is lacking.  Plaintiffs make no substantive response to his argument.

LFUCG's argument is well-taken.  "To sustain a cause of action under 42 U.S.C. § 1985(3), a plaintiff must prove the existence of a conspiracy among 'two or more persons.'" *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.*, 926 F.2d 505, 509 (6th Cir. 1991).

In *Hull*, the Sixth Circuit noted that it "has adopted the general rule in civil conspiracy cases that a corporation cannot conspire with its own agents or employees."  *Id.* (citation omitted).  Because the plaintiff's civil rights claims were against the school district and its employees, the Court concluded: "Since all of the defendants are members of the same collective

32

entity, there are not two separate 'people' to form a conspiracy." *Id. See also Upton v. City of Royal Oak*, 492 F. App'x 492, 503 (6th Cir. 2012) (upholding summary judgment on city firefighter's § 1985 claim against city and city officials).

Therefore, LFUCG is entitled to summary judgment on plaintiffs' § 1985 and § 1986 claims.[11]  The Court thus need not revisit the issue of racial motivation.

### C.   Non-Civil Rights Claims[12]

In its March 13, 2008 opinion, this Court dismissed the claims against LFUCG under RICO, Title IX, Title VII, and 18 U.S.C. § 2255 due to various legal flaws.  (Doc. 313).

The individual defendants now move for dismissal of those same claims against them.  Plaintiffs have not responded in substance to this motion.

### 1.   RICO

The first claim at issue is RICO.  In its prior Order, the Court held that "an allegation of personal injury and

---

[11] "Dismissal of a § 1986 claim is proper if a plaintiff fails to state a cause of action under § 1985." *Thurmond v. County of Wayne*, 447 F. App'x 643, 650 (6th Cir. 2011) (citation omitted).

[12] Because of the legal flaws identified in these claims, the Court need not reach the individual defendants' arguments regarding qualified immunity.

pecuniary loss flowing therefrom does not constitute an 'injury' in one's 'business or property' necessary under 18 U.S.C. § 1964(c) to confer RICO standing." (Doc. 313 at 5). That principle applies equally to the individual defendants, and this claim will be dismissed as to them as well.

### 2.    Title IX

This claim must be dismissed as to the individual defendants because Title IX does not provide for claims against individuals in their personal capacities. *Soper v. Hoben*, 195 F.3d 845, 854 (6th Cir. 1999).

### 3.    Title VII

As this Court has held, plaintiffs' Title VII claims fail for lack of administrative exhaustion, (Doc. 313 at 7), and this also entitles the individual defendants to summary judgment on this claim. Further, there is no individual liability under this statute. *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 405 (6th Cir. 1997).

### 4.    Sexual Exploitation Statutes

Plaintiffs cite various federal criminal statutes that deal with sexual abuse and child pornography, the violation of which gives rise to a private right of action under 18 U.S.C. § 2255. However, there is no evidence that any of the individual defendants violated these underlying

34

criminal statutes, and these claims thus fail as a matter of law.[13]

In addition, as the Court previously held, the federal statute on failure to report child abuse is a criminal statute which provides no private right of action.  (Doc. 313 at 10).

### 5.  Outrage

This claim fails as a matter of law because there is no evidence that the individual defendants acted with the intent to cause plaintiffs emotional distress.

### 6.  Breach of Fiduciary Duty

"Public officials in an individual capacity or otherwise, cannot be expected to protect every individual whether known to them or not from possible harm by third parties."  *Harrison v. Fryman*, 896 S.W.2d 908, 909-10 (Ky. 1995).  "In order to establish an affirmative legal duty on public officials in the performance of their official duties, there must exist a special relationship between the victim and the public officials."  *Id.* at 910 (citation omitted).

This claim fails as a matter of law because plaintiffs

---

[13] The only possible exception to this would be the testimony by John Doe 21 that defendant Michael Wilson had sex with his brother, John Doe 22.  However, John Doe 22 is one of the plaintiffs whose claims were previously dismissed as untimely.

have not shown any special relationship with the individual defendants which would give rise to such a duty.

### 7.   Negligence

"To establish a negligence claim against a public official, the complaint must allege a violation of a special duty owed to a specific identifiable person and not merely a breach of a general duty owed to the public at large." *Id.* (citation omitted).

Plaintiffs have identified no duty owed by these defendants to plaintiffs as support for their negligence claim, which thus also fails as a matter of law.

### D.   Summary of Rulings

(1)   Berry was not acting "under color of state law" for purposes of the § 1983 claims by plaintiffs who allege that they were abused in connection with MCG employment or activities.  All defendants are thus entitled to summary judgment on the claims of those plaintiffs.

(2)   Berry *was* a state actor for purposes of the § 1983 claims asserted by plaintiffs who allege they were abused by Berry in connection with his position as administrator of the Summer Lunch Program.  Defendants are thus not entitled to summary judgment on the § 1983 claims on this basis.

(3)   The individual defendants are nonetheless entitled to summary judgment on all § 1983 claims against them because plaintiffs have failed to identify any duty imposed on them pursuant to state law under the "inaction" theory.

(4)   There is a triable issue of fact as to the § 1983 claims of the two "Lunch Program" plaintiffs against LFUCG because there is evidence from which a jury

36

could find deliberate indifference.

(5)  LFUCG is, however, entitled to summary judgment on plaintiffs' §§ 1985 and 1986 claims.

(6)  The individual defendants are also entitled to summary judgment on all federal and state non-civil rights claims against them.

These rulings thus leave as plaintiffs only the two individuals whose abuse by Berry is alleged to have occurred in connection with Berry's position as administrator of the Summer Lunch Program.  The parties agreed during oral argument that two plaintiffs -- John Doe 39 and Rex Roe 92 – fall into this category.

Further, these rulings leave LFUCG as the only defendant.

Therefore, having reviewed this matter, and the Court being otherwise sufficiently advised,

**IT IS ORDERED** that:

(1)  The individual defendants' motions for summary judgment on plaintiffs' civil rights claims (Docs. 538, 540), motion for summary judgment on all claims other than civil rights claims (Doc. 542), and defendants' motion for summary judgment as to the claims of John Does 33 and 34 and Rex Roes 94 and 95 (Doc. 545) be, and are hereby, **GRANTED**;

(2)   The LFUCG's renewed motion for summary judgment as to plaintiffs' civil rights claims (Doc. 546) be, and is hereby, **GRANTED IN PART AND DENIED IN PART**, consistent with the above discussion;

(3)   The Roe plaintiffs' motion for leave to file surreply (Doc. 637) be, and is hereby, **GRANTED**; and

(4)   **Within thirty (30) days**, the parties shall file status reports indicating how they wish to proceed to resolve the two viable claims identified herein.

This 30th day of May, 2013.



Signed By:

*William O. Bertelsman*  WOB

**United States District Judge**